**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

IN RE:

C.R. STONE CONCRETE
CONTRACTORS, INC.,

        Debtor

Chapter 7
Case No. 05-11119-WCH

---

C.R. STONE CONCRETE
CONTRACTORS, INC.,

        Plaintiff,

vs.

RICHARD ANDERSON;
GILLIAN WELBY; JOHN MARINI;
PLUMB HOUSE, INC.;
DALTON BUILDERS, INC.;
JOHN MARINI MANAGEMENT COMPANY;
LENOX-NORWOOD LLC; AND
THE FRAMING COMPANY, INC.

        Defendants

Adv. Pro. No. 05-01307-WCH

---

**MEMORANDUM OF DECISION**

**I. Introduction**

    The matters before the Court are the Motion by Chapter 7 Trustee for Approval of

Stipulation by and among the Chapter 7 Trustee and John S. Marini, John Marini Management

Company, Lenox-Norwood, LLC and The Framing Company (the "Marini Motion") and the

Motion by Chapter 7 Trustee for Approval of Stipulation by and among the Chapter 7 Trustee and

Richard Anderson, Plumb House, Inc. and Dalton Builders, Inc. (the "Anderson Motion",

1

collectively the "Motions to Approve Stipulations"), which seek to resolve the greater part of the

above-captioned adversary proceeding.  Creditor Riemer & Braunstein, L.L.P. ("R&B") objected

to the Motions to Approve Stipulations.  For the reasons contained herein, I will deny the Motions

to Approve Stipulations.

## II.  Background and Positions of the Parties

C.R. Stone Concrete Contractors, Inc. (the "Debtor") is a Massachusetts corporation that

operated a business performing concrete contracting, design and installation in all phases of

construction.  The Debtor filed a Chapter 11 bankruptcy petition in March of 2005, and the case

was converted to a Chapter 7 in August, 2005.  On April 15, 2005, the Debtor filed its Complaint

initiating the instant adversary proceeding (the "Complaint").

### A.  Events Preceding the Bankruptcy Filing

The Complaint weaves a complex web of interactions among the various defendants as

detailed below.  Since no evidentiary hearings have been held, the recital which follows is drawn

from the pleadings.

Christopher Stone ("Stone"), the president of the Debtor, incorporated the Debtor in 2000

and operated it with increasing profitability between the years of 2001 and 2004.[1]  As of 2004, the

Debtor "was the largest non-union cast in place concrete contractor in Massachusetts, with 140

employees during peak periods and was on track to achieve its highest net profit ever."[2]

Richard Anderson ("Anderson") is the principal of defendants Dalton Builders ("Dalton")

---

[1] Complaint, Adv. Pro. No. 05-1307, Docket No. 1, ¶¶ 13,15.

[2] *Id.* at ¶ 15.

2

and Plumb House (collectively, the "Anderson Defendants").[3]  Dalton and Plumb House are

Massachusetts corporations engaged in the business of general contracting and the Debtor was a

concrete subcontractor for Plumb House on various projects.[4]  Plumb House is the general

contractor on two construction sites, The Ridge in Waltham, Massachusetts ("Waltham Project")

and The Village at Quarry Hills in Quincy, Massachusetts ("Quincy Project").[5]

The Debtor hired Gillian Welby ("Welby")[6] in December 2003 as the Debtor's Project

Manager,[7] and Welby served in that capacity until January 5, 2005.[8]  As Project Manager, Welby

was responsible for the Debtor's project accounting, billing and change order submissions on the

various projects for which the Debtor was a subcontractor.[9]  Welby, who the Debtor claims was

also the "former significant other" of Stone,[10] was not authorized to sign certain documents,

including requisitions and lien waivers, in lieu of Stone's approval.[11]

---

[3] Answer and Counterclaims of Richard Anderson, Plumb House, Inc. and Dalton
Builders, Inc. ("Anderson Answer"), Adv. Pro. No. 05-1307, Docket No. 21, ¶ 2.

[4] Id. at ¶ 16.

[5] See id. at ¶¶ 25, 26.

[6] Welby filed a motion seeking the dismissal of various counts of the Complaint.  I denied
Welby's motion to dismiss on June 29, 2005.  It is also of note in relation to Welby that she was
examined by the Debtor pursuant to Fed. R. Bankr. P. 2004 prior to the commencement of this
adversary proceeding.

[7] Complaint Ex. 1, Gillian Welby's Employment Agreement with C.R. Stone Concrete
Contractors, Inc.

[8] Complaint ¶ 3.

[9] Id.

[10] Id. at ¶ 19.

[11] Id. at ¶ 27.

3

John S. Marini is the principal of defendants John Marini Management Company ("Marini Management"), The Framing Company ("Framing Co.") and Lenox-Norwood LLC ("Lenox," collectively the "Marini Defendants").[12]  Marini Management is a Massachusetts corporation in the business of general contracting.[13]  Lenox is a Massachusetts corporation which owns a construction site in Norwood, Massachusetts ("Norwood Project").[14]  The Norwood Project is managed by the Framing Co. and Marini Management is the general contractor on that site.[15]

The Debtor was a concrete subcontractor for Plumb House and had worked on several jobs for Plumb House prior to engaging in work for the Marini Defendants.[16]  The Debtor claims that through these subcontract jobs Stone developed a "good personal relationship" with the principal of Plumb House, Anderson, and advised him on various aspects of subcontract concrete work.[17]

The Debtor alleges that Anderson and Marini are friends and business associates.[18]  In early 2004, on the recommendation of Anderson, the Debtor submitted a proposal to Marini to

---

[12] Answer of Defendants John Marini, John Marini Management Company, Lenox-Norwood LLC and the Framing Company, Inc., Counterclaim and Jury Demand ("Marini Answer"), Adv. Pro. No. 05-1307, Docket No. 19. ¶ 4.

[13] *See id.* at ¶ 22.

[14] *Id.*

[15] *Id.*

[16] *See* Anderson Answer ¶ 16.

[17] Complaint ¶ 16.  Anderson denies that Stone gave him advice on concrete work. Anderson Answer ¶ 16.

[18] Complaint ¶ 18; *See* Anderson Answer ¶ 18 (admitting that Stone and Anderson were friends and business associates), Marini Answer ¶ 18 (admitting that Stone and Marini were business associates and denying that they were friends).

4

undertake concrete subcontract work at the Norwood Project.[19]  Marini accepted the Debtor's bid

for the Norwood Project in the amount of $2,200,000 by executing the Debtor's project proposal

on March 10, 2004.  Marini approved a second subcontract for an additional $150,000 of work on

May 10, 2004.[20]  The Debtor also subcontracted the two Plumb House projects, and on July 2,

2004, Welby, on the Debtor's behalf, executed subcontracts on the Waltham and Quincy Projects

for $1,025,000 and $1,800,000, respectively.[21]

The Debtor claims that it delivered "substantial amounts of expensive equipment,

materials and tools" to the Norwood, Quincy and Waltham Projects to perform the subcontracts.[22]

According to the Debtor, as work on the Quincy Project progressed Anderson advised Stone in the

fall of 2004 that the Debtor would need to complete the project in five months instead of the

originally planned year and a half.[23]  Although under similar circumstances the Debtor had

---

[19] Anderson Answer ¶ 22, Marini Answer ¶ 22.

[20] Complaint ¶¶ 23, 24; *see* Marini Answer ¶¶ 23, 24 (admitting that the Debtor agreed to construct a retaining wall at the Norwood Project for $150,000, and admitting that Marini signed a proposal for $2,200,000 of work on the Norwood Project, but denying that the document attached as Exhibit 3 to the Complaint comprised the final agreement for the Norwood work).

[21] Anderson Answer ¶¶ 25, 26.

[22] Complaint ¶ 28.  Specifically, the Debtor claims that it delivered $800,000 worth of concrete forms, supplies, equipment, tools and a forklift to the Norwood Project, a crane and construction materials with a value of $330,000 to the Waltham Project, and $1,120,000 of property to the Quincy Project consisting of a crane and various other concrete construction equipment. *Id.*  The Anderson Defendants and Marini Defendants admit that the Debtor delivered certain items to the Quincy, Waltham and Norwood Projects, but deny any assertions as to the nature or value of those items.  Anderson Answer ¶ 28, Marini Answer ¶ 28.

[23] Complaint ¶ 29.  The Anderson Defendants deny this assertion.  Anderson Answer ¶ 29.

previously required a change order to the subcontract price to reflect the expedited nature of a

project, the Debtor alleges that Stone and Anderson negotiated and orally agreed that there would

be no such change order in exchange for Dalton providing free additional manpower to assist the

Debtor.[24]

During the fall and winter of 2004, while the Debtor was working on the Norwood,

Quincy and Waltham Projects, the Debtor alleges that Welby and Anderson with the assistance of

Marini "joined together to strip [the Debtor's] lucrative business away from it and transfer it to

Anderson."[25]  During this time, Anderson is alleged to have told Plumb House employees that he

wanted Welby and other of the Debtor's employees to work for Plumb House and Dalton and that

within five years ninety-percent of Plumb House revenue would be the result of concrete

construction work.[26]

As part of the alleged conspiracy among Welby, Anderson and Marini, Welby allegedly

failed to submit prepared draft change orders to the Marini Defendants for the Debtor's extra work

at the Norwood Project.[27]  Concerning the Norwood Project, Welby allegedly went beyond her

authority and forged Stone's signature on lien waivers and requisitions for project work.[28]  Welby

also allegedly did not submit change orders for the Debtor's extra work at the Quincy and

---

[24] Complaint ¶ 29.  The Anderson Defendants deny this allegation.  Anderson Answer
¶ 29.

[25] Complaint ¶ 30.

[26] *Id.* at ¶ 31.  *See also* Complaint Ex. 6, Witness Statement of Brian Armitage ¶¶ 4, 5, 6.
The Anderson Defendants deny these allegations.  Anderson Answer ¶ 31.

[27] Complaint ¶ 32.

[28] *Id.* at ¶ 33.

Waltham Projects.[29]

In December of 2004, the Debtor alleges that at Anderson's direction Plumb House withheld payment of the Debtor's submitted requisitions of November 30, 2004, on account of alleged expenses Dalton incurred assisting the Debtor on the expedited Quincy project.[30]  The Debtor alleges that Plumb House withheld payments in contravention of the oral agreement between Stone and Anderson regarding same.[31]

At the same time, Welby had allegedly forged Stone's signature on various requisitions and as of December 2004 had stopped preparing and submitting requisitions for the Debtor's work at the Norwood, Quincy and Waltham Projects.[32]  The net effect of Welby's actions, claims the Debtor, was to substantially underbill for the Debtor's work on all three projects and to stifle the Debtor's cash flow by January 2005.[33]  The Debtor alleges that both Anderson and Marini were aware of and assisted in Welby's actions to benefit Anderson.[34]  Anderson, Marini and Welby also allegedly contacted the Debtor's suppliers and encouraged them to demand payment from the Debtor despite any contrary terms in the suppliers' agreements with the Debtor.[35]

---

[29] *Id.* at ¶ 32.

[30] *Id.* at ¶ 34.

[31] *Id.*

[32] *Id.* at ¶ 35.

[33] *Id.* at ¶¶ 38, 41.

[34] *Id.* at ¶¶ 39, 40.  The Anderson Defendants and Marini Defendants deny the existence of any conspiracy.  Anderson Answer ¶¶ 39, 40, Marini Answer ¶ 39, 40.

[35] Complaint ¶ 37.  Anderson and Marini admit to communicating with the Debtor's suppliers, but insist that they did so because of suppliers' complaints that the Debtor was not

During the first week of January 2005, Stone requested an advance from Anderson of

$200,000 upon the Debtor's December 2004 work to which Anderson allegedly agreed.[36]  On

January 7, 2005, Stone visited the Plumb House office to receive the advance, but instead was

given a letter, titled "Termination of Contract," which terminated the Debtor's subcontracts on the

Quincy and Waltham Projects.[37]  Specifically, the Termination of Contract stated:

> Please be advised that Plumb House, Inc. is terminating your subcontracts at both
> Quarry Hills (Quincy) and The Ridge (Waltham) for your failure to pay suppliers
> which has resulted in liens being placed on both projects, pursuant to sections 9.1
> and 9.3 of your subcontract.  Unless you give the undersigned satisfactory evidence
> of payment of all subcontractors and suppliers and removal of all liens by Tuesday,
> January 11, 2004, your contracts will terminate and we will take possession of all
> equipment and materials on site.  You will also be responsible for all damages
> Plumb House, Inc. may suffer as a result of your defaults.[38]

On January 7, 2005, Anderson and Welby allegedly contacted key employees of the

Debtor with the purpose of usurping the Debtor's work force for Plumb House.[39]  The next day,

the Debtor claims that Anderson held a meeting with key employees of the Debtor and advised

them that the Debtor had been terminated from the Quincy and Waltham Projects and advised the

Debtor's foreman on the Norwood Project that Marini would also be terminating the Debtor's

--------

making payments.  Anderson Answer ¶ 37, Marini Answer ¶ 37.

[36] Complaint ¶ 42.  The Anderson Defendants admit that Stone requested an advance, but
deny that Anderson approved it.  Anderson Answer ¶ 42.

[37] Complaint ¶ 43.

[38] Complaint Ex. 7.  The letter was apparently erroneously dated January 7, 2004.

[39] Complaint ¶¶ 46, 47, 48.  The Anderson Defendants deny these allegations.  Anderson
Answer ¶¶ 46, 47, 48.

subcontract on that project.[40]  According to the Debtor, Anderson encouraged the employees to

return to the Plumb House offices on January 9, 2005 to fill out Plumb House job applications if

they wanted to keep working on the various project sites.[41]

     The Debtor claims that on January 8, 2005, Stone spoke to Marini concerning the

Norwood Project.[42]  Marini assured Stone that the Debtor would be permitted to continue and

complete its work on the Norwood Project which was, according to the Debtor, 95% complete.[43]

Despite Marini's alleged assurance, Stone was notified at approximately 6:00 A.M. on January 10,

2005 that the Debtor's employees would not be permitted to work at the Norwood Project or

recover any of the Debtor's property and equipment therefrom.[44]  The Debtor was similarly unable

to recover any property and equipment from the Quincy and Waltham Projects.[45]  Later that same

day, the Debtor received a letter titled "Termination of Contract/Lenox Station, Norwood, MA"

from a representative of Marini Management which stated:

---

[40] Complaint ¶ 49.  The Anderson Defendants admit that Anderson met with several
employees of the Debtor on January 8, 2005, but deny the remainder of the allegations as stated.
Anderson Answer ¶ 49.

[41] Complaint ¶ 49.

[42] *Id.* at ¶ 51.  The Marini Defendants admit that Marini had a conversation with Stone on
January 10, 2005, but deny Stone's allegations as to the substance of their discussions and deny
that the Norwood Project was 95% complete.  Marini Answer ¶ 49.

[43] Complaint ¶ 51.

[44] *Id.* at ¶ 53.  The Marini Defendants admit that the Debtor was terminated, but deny the
remainder of the Debtor's allegations.  Marini Answer ¶ 53.

[45] Complaint ¶ 54.  The Anderson Defendants contend that they lawfully retained
equipment and property necessary to complete the Quincy and Waltham projects pursuant to their
agreements with the Debtor.  Anderson Answer, Counterclaims ¶ 32.

. . . Marini Management is terminating your sub-contract dated March 23, 2004, at Lenox Station, Norwood, MA, for your failure to pay suppliers which has resulted in liens having been placed on the project and there is satisfactory evidence of further liens being placed imminently.  Unless you give [Marini Management] satisfactory evidence of payment of all sub-contractors and suppliers and removal of all liens by Tuesday, January 11, 2005 at 4:00p.m., your contract will be considered terminated and [Marini Management] shall take possession of all equipment and materials on site.  You will also be responsible for all damages Marini Management may encore [*sic*] as a result of your default.[46]

The Debtor alleges that when Welby left the Debtor's offices on January 7, 2005, she took a laptop computer and various documents of the Debtor.[47]  The Debtor also alleges that Welby deleted unsubmitted change orders for the Norwood Project from the Debtor's computer system, forged Stone's signature on various documents including lien release and requisition forms, left the Debtor's documents and records in a state of disarray and improperly delivered the Debtor's proprietary and confidential business information to Anderson.[48]

Following termination from the Norwood, Quincy and Waltham Projects, the Debtor filed Notices of Contract and Statements of Amounts Due pursuant to Mass. Gen. Laws ch. 254, §§ 4[49]

---

[46] Complaint ¶ 55, Complaint Ex. 9.

[47] *Id.* at ¶ 58.

[48] *Id.* at ¶ 59.

[49] Mass. Gen. Laws ch. 254, § 4 provides for filing and recording of a notice of contract. That section provides in pertinent part

> Such person may file or record the notice of contract at any time after execution of the written contract whether or not the date for performance stated in such written contract has passed and whether or not the work under such contract has been performed, but not later than the earliest of: (i) sixty days after filing or recording the notice of substantial completion under section two A; or (ii) ninety days after filing or recording of the notice of termination under section two B; or (iii) ninety days after the last day a person entitled to enforce a lien under section two or anyone claiming by, through or under him performed or furnished labor or

and 8[50] against all three projects in order to preserve mechanic's lien claims.[51]  On February 10,

2005, Marini Management brought suit in Norfolk Superior Court[52] to discharge the Debtor's

---

> materials or both labor and materials to the project or furnished rental equipment,
> appliances or tools.
>
> [. . . .]
>
> Upon filing or recording a notice, as hereinbefore provided, and giving actual
> notice to the owner of such filing, the subcontractor shall have a lien upon such
> real property, land, building, structure or improvement owned by the party who
> entered into the original contract as appears of record at the time of such filing, to
> secure the payment of all labor and material and rental equipment, appliances or
> tools which he is to furnish or has furnished for the building or structure or other
> improvement, regardless of the amount stated in the notice of contract. Such lien
> shall not exceed the amount due or to become due under the original contract as of
> the date notice of the filing of the subcontract is given by the subcontractor to the
> owner.

[50] Mass. Gen. Laws ch. 254, § 8 provides in pertinent part

> Liens under sections two and four shall be dissolved unless the contractor,
> subcontractor, or some person claiming by, through or under them, shall, not later
> than the earliest of: (i) ninety days after the filing or recording of the notice of
> substantial completion under section two A; (ii) one hundred and twenty days
> after the filing or recording of the notice of termination under section two B; or
> (iii) one hundred and twenty days after the last day a person, entitled to enforce a
> lien under section two or anyone claiming by, through or under him, performed or
> furnished labor or material or both labor and materials or furnished rental
> equipment, appliances or tools, file or record in the registry of deeds in the county
> or district where the land lies a statement, giving a just and true account of the
> amount due or to become due him, with all just credits, a brief description of the
> property, and the names of the owners set forth in the notice of contract.

[51] Complaint ¶ 63.  The Anderson Defendants contend that the documents the Debtor
filed were false and fraudulent.  Anderson Answer ¶ 63.

[52] Marini Management brought suit in the Commonwealth of Massachusetts, Superior
Court Department, Norfolk County.  The court will be referred to as "Norfolk Superior Court"
and the case will be referred to as the "Norfolk Action."

mechanic's lien claim on the Norwood Project pursuant to Mass. Gen. Laws. ch. 254, § 15A.[53]

Prior to a hearing, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code on

February 18, 2005.

### B. Events Following the Bankruptcy Filing

On February 24, 2005, the Debtor filed its Application of Debtor-In-Possession to

Employ Counsel (the "Application to Employ") seeking to employ R&B as its counsel in its

---

[53] Plaintiff's Memorandum of Law in Opposition to Marini Defendants' Motion to Dismiss Adversary Complaint, and in Opposition to John Marini Management Company's "Emergency Motion to Dismiss Complaint and Expunge Recording of Complaint from the Registry of Deeds and for Rule 11 Sanctions" in Adversary Proceeding 05-1348, Adv. Pro. No. 05-1307, Docket No. 52 ("Plaintiff's Opposition"), p. 7.  Mass. Gen. Laws ch. 254, § 15A provides in pertinent part

> If any person in interest, including but not limited to an owner, contractor, or mortgage holder, claims (a) that any person who has provided labor or materials or has agreed to provide funding, financing or payment for labor or materials, refuses to continue to provide such funding, financing or payments of labor or materials solely because of the filing or recording of a notice of contract pursuant to section two or a statement of claim referencing a lien under section one, or (b) it appears from the notice of contract or a statement of account that the claimant has no valid lien by reason of the character of, or the contract for, the labor or materials or rental equipment, appliances or tools furnished and for which a lien is claimed, or (c) that a notice or other instrument has not been filed or recorded in accordance with the applicable provisions of this chapter, or (d) that for any other reason a claimed lien is invalid by reason of failure to comply with any provision of this chapter, or (e) that any party's rights are foreclosed by a judgment or release, or (f) that any party wrongfully refuses to execute a notice of completion as required by section two A or improperly files or records a notice of termination under section two B, such person may apply to the superior court for the county where such land lies or in the district court in the judicial district where such land lies, for an order (i) ruling on the matter involved or (ii) summarily discharging of record the alleged lien or notice as the case may be. . . .  The application shall be made upon a verified complaint accompanied by other written proof of the facts upon which the application is made. Upon granting or denying the application, the court shall enter a final judgment on the matter involved or expeditiously order such further proceedings as are just.

12

bankruptcy and in any related litigation. The Application to Employ proposed employment on a

contingent basis as to litigation related to the Debtor's bankruptcy. I granted the Application to

Employ on February 28, 2005, with the caveat "[a]greed fees subject to subsequent review by the

Court and are not approved in adversary proceeding."[54]

On March 7, 2005, the Debtor instituted an adversary proceeding pursuant to 11 U.S.C.

§ 542 seeking the turnover by the Marini Defendants and Anderson Defendants of the Debtor's

property that was allegedly retained by them at the Waltham, Quincy and Norwood Projects.[55]

On the same date, Marini Management filed its Motion by John Marini Management Company

for Relief from the Automatic Stay (the "Motion for Relief") in the Debtor's case.[56]  In the

Motion for Relief, Marini Management sought this Court's authorization to resume the Norfolk

Action as concerns the mechanic's lien and to amend Marini Management's pleadings to

prosecute Marini Management's asserted contract claims against the Debtor.  The Debtor

opposed the Motion for Relief and I held a hearing on both the Motion for Relief and the

turnover matter on March 22, 2005.  After argument by the parties, I entered a formal order on

the Motion for Relief lifting the automatic stay "for the limited purpose of allowing Marini to

continue the proceeding to dissolve the mechanic's lien pursuant to [Mass. Gen. Laws ch. 254,

§ 15A]."[57]  As for the adversary proceeding concerning turnover of the Debtor's property, I

entered an order directing Marini and Marini Management to "as soon as practicable, assemble

---

[54] Order Re: Application to Employ, Docket No. 25.

[55] See Adv. Pro. No. 05-1241.

[56] Motion for Relief, Docket No. 51.

[57] Case No. 05-11119, Docket No. 104.

13

and return all of the Debtor's property within their custody."[58]  The Debtor alleges that much of the property returned to it pursuant to that order was damaged and that some of its property was never returned.[59]

The Norfolk Action resumed on April 5, 2005.[60]  The next day, Norfolk Superior Court issued a notice allowing the dissolution of the Debtor's mechanic's lien on the Norwood Project.[61]  On April 11, 2005, Norfolk Superior Court entered an order dissolving the Norwood Project mechanic's lien.[62]  The Debtor has appealed the order and judgment dissolving the mechanic's lien to the Appeals Court of Massachusetts and said appeal is currently pending.[63]  On April 20, 2005, the Debtor filed suit in Norfolk Superior Court to perfect and enforce its mechanic's lien against the Norwood Project pursuant to Mass. Gen. Laws ch. 254, §§ 5[64] and

---

[58] Order for Turnover by Defendants John Marini Management Company and John Marini, Adv. Pro. No. 05-1241, Docket No. 28, p. 2.  The Order does not mention the Anderson Defendants because, according to the Debtor, they agreed to voluntarily turn over all of the Debtor's equipment in their possession on the eve of the hearing.  *See* Complaint ¶ 69.

[59] Complaint ¶¶ 72, 73.

[60] Plaintiff's Opposition p. 9.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 10.

[64] Mass. Gen. Laws, ch. 254, § 5 provides in pertinent part

A lien upon land for the erection, alteration, repair or removal of a building or other structure or other improvement of real property or a lien established under section seventy-six of chapter sixty-three, section six of chapter one hundred and eighty-three A, or subsection (a) of section twenty-nine of chapter one hundred and eighty-three B shall be enforced by a civil action brought in the superior court for the county where such land lies or in the district court in the judicial district

14

11[65] and subject to the pending appeal ("Lien Enforcement Action").

Thereafter, the Debtor instituted an adversary proceeding by filing a Notice of Removal

pursuant to 28 U.S.C. § 1452(a)[66] and Fed. R. Bankr. P. 7027[67] seeking to remove the Lien

Enforcement Action to this Court.[68] The Marini Defendants sought a remand of the Lien

Enforcement Action to Norfolk Superior Court and, at a hearing on the matter, I denied the

request for remand because I recognized that the underlying mechanic's lien issue "so affects my

---

where such land lies. The plaintiff shall bring his action in his own behalf and in
behalf of all other persons in interest who shall become parties. An attested copy
of the complaint, which shall contain a brief description of the property sufficient
to identify it, and a statement of the amount due, shall be filed in the registry of
deeds and recorded as provided in section nine within thirty days of the
commencement of the action, or such lien shall be dissolved.

[65] Mass. Gen. Laws, ch. 254, § 11 provides

The lien shall be dissolved unless a civil action to enforce it is commenced within
ninety days after the filing of the statement required by section eight. The validity
of the lien shall not be affected by an inaccuracy in the description of the property
to which it attaches, if the description is sufficient to identify the property, or by
an inaccuracy in stating the amount due for labor or material unless it is shown
that the person filing the statement has wilfully and knowingly claimed more than
is due him.

[66] 28 U.S.C. § 1452(a) provides:

A party may remove any claim or cause of action in a civil action other than a
proceeding before the United States Tax Court or a civil action by a governmental
unit to enforce such governmental unit's police or regulatory power, to the district
court for the district where such civil action is pending, if such district court has
jurisdiction of such claim or cause of action under section 1334 of this title.

[67] Fed. R. Bankr. P. 9027 outlines the procedural requirements of filing a Notice of
Removal and proceedings related thereto.

[68] *See* Adv. Pro. No. 05-1348, Docket No. 1.

15

case that I have to hang on to it."[69]

The Debtor filed the instant adversary proceeding against the Marini, Anderson and other named defendants on April 15, 2005.  Despite increasing profits up until 2004, the Debtor contends that it was forced into bankruptcy because the defendants "joined together in bad faith to seize control of all of C.R. Stone's property; to raid C.R. Stone's employees; and to take over the highly profitable business of [C.R. Stone]."[70]  The relief sought by the Debtor against the Anderson Defendants and Marini Defendants is turnover of the Debtor's business and property (Count I); damages for the post-petition use of, damage to, and failure to return the Debtor's property (Count II); recovery of the Debtor's property fraudulently transferred to the Marini Defendants and Anderson Defendants (Count III); damages for the conversion of the Debtor's property (Count IV); damages for civil conspiracy to destroy the Debtor and steal its business (Count V); damages for breach of contract and to enforce a mechanic's lien against the Marini Defendants (Count VI); damages for Plumb House's Breach of Contract on the Waltham (Count VII) and Quincy (Count VIII) projects; damages for breach of the obligations of good faith and fair dealing by Plumb House and Marini Management (Count IX); damages for interference with the Debtor's contractual relationships (Count X); damages for violations of Mass. Gen. Laws ch. 93A, which prohibits unfair or deceptive acts or practices (Count XI); equitable subordination of the claims of all defendants (Count XII); recovery of preferential transfers (Count XIII); damages for violations of the automatic stay (Count XIV); damages for interference with contract rights by the Anderson Defendants (Count XVII); damages for interference with advantageous business

---

[69] Transcript of Hearing on Emergency Motion to Remand Case, June 8, 2005, p. 15.

[70] Complaint p. 1.

16

relations by the Anderson Defendants (Count XVIII); equitable estoppel to prevent the Anderson

Defendants from benefitting from their wrongdoing (Count XIX), and; creation of a constructive

trust to sequester the ill-gotten gains of the Anderson Defendants (Count XX). The Marini

Defendants filed a motion to dismiss counts I, VI, X, XII, and XIV for either lack of jurisdiction

over the subject matter or failure to state a claim upon which relief may be granted.[71]

On July 11, 2005, Plumb House filed a motion seeking the conversion of the Debtor's

case to a Chapter 7 proceeding on the grounds that there was no reasonable likelihood of

reorganization, an inability to effectuate a plan and a lack of good faith. After a hearing on

August 17, 2005, I granted Plumb House's request. Joseph G. Butler was appointed Chapter 7

Trustee (the "Trustee") on August 22, 2005. On August 31, 2005, Stone committed suicide.[72]

### C. The Motions to Approve Stipulations

The conversion of the case from Chapter 11 to Chapter 7 placed responsibility for going

forward with pending adversary proceedings on the Trustee. On March 28, 2006, the Trustee

filed the Stipulation by and among Chapter 7 Trustee and John S. Marini, John Marini

Management Company, Lenox-Norwood, LLC and The Framing Company (the "Marini

Stipulation") and the Marini Motion seeking approval of the stipulation resolving the above-

---

[71] *Id.* at ¶¶ 75-172, Motion to Dismiss Adversary Complaint of Defendants John Marini, John Marini Management Company, Lenox-Norwood LLC, and The Framing Company, Inc. ("Marini Motion to Dismiss"), Adv. Pro. No. 05-1307, Docket No. 19. I took the Marini Motion to Dismiss under advisement following a hearing on June 29, 2005, but my consideration of the Marini Motion to Dismiss was arrested when the case converted to one under Chapter 7 and responsibility for continuing with the adversary proceeding fell to the Trustee.

[72] Response of Richard Anderson, Plumb House, Inc. and Dalton Builders to Opposition of Reimer and Braunstein LLP to Motion by Chapter 7 Trustee to Approve Stipulation by and among Chapter 7 Trustee and Marini Defendants, Ex. 2, August 31, 2005 Police Report, Docket No. 496.

captioned adversary proceeding as to the Marini Defendants. On April 26, 2006, the Trustee

filed the Stipulation by and between Chapter 7 Trustee and Richard Anderson, Plumb House,

Inc., and Dalton Builders, Inc. (the "Anderson Stipulation," together with the Marini Stipulation,

the "Stipulations") and the Anderson Motion, seeking to resolve the above-captioned adversary

proceeding as to the Anderson Defendants.

The Marini Stipulation provides that the Marini Defendants will pay $25,000 to the

Trustee, the Complaint will be dismissed as to the Marini Defendants, the Trustee will release all

claims that could be brought against the Marini Defendants in this case, and the Marini

Defendants will be allowed a $531,194.44 unsecured nonpriority claim in the Debtor's Chapter 7

case.[73] According to the Marini Stipulation the Marini Defendants contend that the Debtor owes

them $531,194.44 as a result of their overpayments to the Debtor and the Debtor's breach of its

contract with the Marini Defendants for the Norwood project.[74]

The Anderson Stipulation provides that the Anderson Defendants will pay $35,000 to the

Trustee, the Complaint will be dismissed as to the Anderson Defendants, the Trustee will release

all claims that could be brought against the Anderson Defendants in this case, and the Anderson

Defendants will be allowed a $175,329 unsecured claim in the Debtor's Chapter 7 case.[75] The

Anderson Defendants have filed claims totaling $175,329 plus interest, attorneys fees, costs and

treble damages for the Debtor's knowing and intentional violations of Mass. Gen. Laws ch.

---

[73] Marini Stipulation, Docket No. 463.

[74] *Id.* at 6.

[75] Anderson Stipulation, Docket No. 481.

18

93A.[76]

In the Motions to Approve Stipulations, which are very similar to each other, the Trustee states that he made his decision to settle with the Anderson Defendants and the Marini Defendants after discussions with R&B, Marini, Anderson, Welby, and the Debtor's former accountant, and after reading the voluminous pleadings filed in the main case and the various related adversary proceedings.[77]  The Trustee notes that the claims of the Anderson Defendants and the Marini Defendants that the Debtor was terminated from the Norwood, Quincy and Waltham projects for good cause are supported,[78] and states that Anderson, Marini, and Welby all denied the Debtor's claims.[79]  The Trustee also states that "[it would be extremely difficult, if not impossible, to prove the existence of [the conspiracy alleged in the Complaint] absent any admission by at least one of the alleged co-conspirators that it existed,"[80] and notes that continuing forward with the litigation would be time consuming and expensive.[81]  Addressing the Debtor's contentions that the Anderson Defendants and Marini Defendants unlawfully retained equipment of the Debtor after the Debtor's termination, the Trustee states that "[a]lthough the Trustee understands that there may be a witness who was a former employee of the Debtor who would testify that the equipment which was returned had not been properly maintained while in

---

[76] *Id.* at 6.

[77] Marini Motion, Docket No. 464, ¶ 38, Anderson Motion, Docket No. 482, ¶ 43.

[78] Marini Motion ¶ 40, Anderson Motion ¶ 45.

[79] Marini Motion ¶ 42, Anderson Motion ¶ 47.

[80] Marini Motion ¶ 43, Anderson Motion ¶ 48.

[81] Marini Motion ¶ 49, Anderson Motion ¶ 54.

19

the possession of the [Marini and Anderson Defendants], the Trustee understands that some significant part of the equipment was not owned by the Debtor but was, instead, leased, and that the value of the equipment which was owned by the Debtor was questionable."[82]  Additionally, the Trustee states that the Anderson Defendants had "paid more than $200,000.00 to subcontractors and suppliers of the Debtor in connection with the Quincy and Waltham Projects"[83] and that the Marini Defendants had "paid $498,293.19 to subcontractors and suppliers of the Debtor in connection with the Norwood Project and approximately $300,430.39 to repair alleged construction defects in the work done by the Debtor and to complete the unfinished work of the Debtor on the Norwood Project."[84]  The Trustee also conjectures in the Marini Motion that Marini had no motive to help Anderson steal the Debtor's business, as Marini would not benefit from such an action.[85]  Finally, according to the Trustee the estate currently holds $5,638.36 in cash, which is completely insufficient to support any kind of complex litigation.[86]

R&B filed objections to the Motions to Approve Stipulations.[87]  In the Objections to

---

[82] Marini Motion ¶ 45, Anderson Motion ¶ 50.

[83] Anderson Motion ¶ 46.

[84] Marini Motion ¶ 41.

[85] *Id.* at ¶ 44.

[86] Marini Motion ¶ 48, Anderson Motion ¶ 53.

[87] Objection of Creditor, Riemer & Braunstein LP to Motion by Chapter 7 Trustee to Approve Stipulation by and among Chapter 7 Trustee and John S. Marini, John Marini Management Company, Lenox-Norwood, LLC and The Framing Company (the "Objection to Marini Stipulation"), Docket No. 480, Objection of Creditor, Riemer & Braunstein LP to Motion by Chapter 7 Trustee to Approve Stipulation by and among Chapter 7 Trustee and Richard Anderson, Plumb House, Inc., and Dalton Builders, Inc. (the "Objection to Anderson Stipulation"), Docket No. 513 (collectively, the "Objections to Stipulations").

20

Stipulations R&B argues that the Trustee failed to conduct a sufficiently thorough examination of the allegations in the Complaint and that the Stipulations, which it characterizes as providing only nuisance value, fail to benefit the estate sufficiently to meet the established minimum standard for bankruptcy settlements in the First Circuit.  R&B points out that the Trustee did not question Anderson, Marini, or Welby under oath, and contends that the Trustee failed to consider substantial evidence buttressing the allegations contained in the Complaint.

R&B calls attention to the affidavits of Brian Armitage ("Armitage"), a former Plumb House employee who claims that the Debtor's work was satisfactory and that Anderson told him of his intention to take over the Debtor's business,[88] and Shaun Hill ("Hill"), a former employee of the Debtor who claims that the Debtor's work was good, that the Debtor had finished 90% of the work on the Waltham and Norwood projects and 50% of the work on the Quincy Project, and that at a January 8, 2005 meeting with Anderson, Anderson told him and other employees of the Debtor to fill out employment applications.[89]  The Trustee, says R&B, did not interview Hill or Armitage and did not place sufficient weight on their claims.  R&B also claims that the Trustee failed to interview the many employees of the Debtor who can attest to the damaged condition of the Debtor's concrete forms and other property when the Anderson Defendants and Marini Defendants returned it in March of 2005.[90]  In addition, R&B points to emails produced by the Anderson Defendants in which Anderson and various employees and associates discuss the termination of the Debtor's contracts and the intention of the Anderson Defendants to build a

---

[88] Objection to Anderson Stipulation Ex. 4, Witness Statement of Brian Armitage.

[89] Objection to Anderson Stipulation Ex. 5, Witness Statement of Shaun Hill.

[90] Objection to Marini Stipulation p. 10.

21

concrete business.[91]  R&B additionally argues that the Trustee ignored the 2004 examination of

Welby, at which she asserted her Fifth Amendment rights in response to every question she was

asked, including questions about her involvement in a conspiracy with Marini and Anderson to

destroy the Debtor's business.[92]  R&B points out that a court in a civil case may draw a negative

inference from a deponent's assertion of her Fifth Amendment privilege, and R&B argues that

such a negative inference, if drawn, would make it easier to prove the Debtor's allegations at

trial.  R&B also asserts that the Debtor was owed money when it was terminated, and points to

requisition forms and other financial documents filed along with the Objections to Stipulations.[93]

Regarding the value of the settlement to the estate, R&B asserts that the claims in the

Complaint have a combined value "well in excess of $1,000,000."[94]  R&B states that it is willing

to prosecute the Complaint for the benefit of the estate on a contingency basis, and argues that,

given this fact, the settlement is of no value to the estate.[95]

The Anderson Defendants and the Marini Defendants also responded to the Objections to

Stipulations.  The Anderson Defendants filed their Response of Richard Anderson, Plumb

House, Inc. and Dalton Builders to Opposition of Riemer and Braunstein LP to Motion by

Chapter 7 Trustee to Approve Stipulation by and among Chapter 7 Trustee and Marini

---

[91] Objection to Anderson Stipulation Ex. 6, Anderson Defendants Emails.

[92] Complaint Ex. 10, Transcript of Rule 2004 Examination of Gillian Welby.

[93] *See* Objection to Anderson Stipulation p. 6 (describing financial documents related to the Quincy Project and the Waltham Project that R&B filed as exhibits to the Objection to Anderson Stipulation).

[94] *Id.* at 16.

[95] *Id.* at 24-25.

Defendants (the "First Anderson Reply") on May 8, 2006,[96] and their Reply of Richard

Anderson, Plumb House, Inc. and Dalton Builders to Opposition of Riemer and Braunstein LP to

Motion by Chapter 7 Trustee to Approve Stipulation by and among Chapter 7 Trustee and Plumb

House Defendants (the "Second Anderson Reply") on June 13, 2006.[97]  The Marini Defendants

filed their Reply to Objection of Creditor, Riemer & Braunstein, LP to Motion by Chapter 7

Trustee to Approve the Stipulation by and among Chapter 7 Trustee and John S. Marini, John

Marini Management Company, Lenox-Norwood, LLC and The Framing Company (the "Marini

Reply") on May 8, 2006.[98]

The version of events put forward by the Anderson Defendants and the Marini

Defendants is much different than that put forward by R&B and the Debtor.  The defendants

contend that the Debtor was undone by the folly and failure of its principal, Stone.[99]  According

to the defendants, Stone had a serious drug problem and many related personal problems.[100]  The

Anderson Defendants and the Marini Defendants claim that in 2004 Stone took a great deal of

money out of the Debtor in the form of personal loans, and they submitted balance sheets

---

[96] First Anderson Reply, Docket No. 496.

[97] Second Anderson Reply, Docket No. 528.

[98] Marini Reply, Docket No. 494.

[99] *See* First Anderson Reply p. 1.

[100] Second Anderson Reply p. 2.  The Anderson Defendants filed exhibits that appear to corroborate the assertion that Stone was a user of interveinous drugs.  First Anderson Reply Ex. A, Drug Treatment Center Receipt From January, 2004, Docket No. 533, First Anderson Reply Ex. B, August 31, 2005 Police Report, Docket No. 533.  R&B objected to the consideration of this evidence, but as I do not make any determination as to the admissibility of the evidence or its probative value, I can consider the fact of its existence.

showing large personal loans from the Debtor to Stone and other officers of the Debtor.[101]  The

Marini Defendants and the Anderson Defendants also contend that the Debtor lost a substantial

amount of money in 2004 and was on shaky financial ground even before the problems at the

Norwood, Quincy, and Waltham projects metastasized in December of that year.[102]  The

Anderson Defendants submitted the Debtor's 2004 balance sheet through November 30, 2004,

which shows that as of November 30, 2004 the Debtor's liabilities exceeded its assets by

$78,172.86 and that the Debtor had only $3,054.84 in cash.[103]

The reason for their termination of the Debtor, say the Marini Defendants and the

Anderson Defendants, was the Debtor's failure to pay suppliers and employees in late 2004,

resulting in work delays and the filing of mechanic's liens, and the Debtor's shoddy

workmanship.[104]  The Marini Defendants point to the affidavit of Robert Kelliher ("Kelliher"), a

supervisor on the Norwood Project, in which he states that the Debtor was paid $2,118,470.86 on

its $2,383,000 contract for the Norwood Project.[105]  Kelliher also states in his affidavit that the

Debtor's work was unsatisfactory and Stone's behavior erratic in the later months of 2004, that

the Debtor had misspent funds directed to it specifically for the payment of suppliers, and that the

Debtor was responsible for the nonpayment of several suppliers who responded by placing

---

[101] *See* Second Anderson Reply Ex. L, C.R. Stone 2004 General Ledger, Docket No. 534.

[102] *See* Second Anderson Reply Ex. A, C.R. Stone Income Statement for January 1, 2004 through November 30, 2004, Docket No. 533.

[103] *Id.*

[104] *See generally*, Second Anderson Reply, Marini Reply.

[105] Marini Reply Ex. B, Affidavit of Robert Kelliher.

24

mechanic's liens on the Norwood Project.[106]

The Anderson Defendants and the Marini Defendants submitted other evidence in addition to the affidavit of Kelliher that they argue demonstrates that the Debtor's work was shoddy. The Marini Defendants submitted a report about a December 22, 2004 concrete slab failure at the Norwood Project.[107] The January 12, 2005 report, prepared by an outside engineering firm, describes the likely causes for the slab failure and includes a discussion of the concrete work in the vicinity of the failure.[108] The report indicates that the failure was probably caused by a combination of poorly mixed concrete and improper cold weather protection.[109] The report also states that certain methods for strengthening concrete slabs and anchorages were not used.[110] The report concludes that the concrete in the vicinity, while not properly protected from the cold weather, is likely able to perform adequately and will probably not need to be replaced, although that is a determination best left to on-site management.[111] The Marini Defendants also filed a facsimile from a supplier to the Debtor regarding a December 16, 2004, concrete failure in a basement at the Norwood Project, but the facsimile does not indicate the cause of the failure or

---

[106] *Id.*

[107] Marini Reply Ex. F, Report on Norwood Project Slab Failure.

[108] *Id.*

[109] *Id.* at 5, 6.

[110] *Id.* at 5.

[111] *Id.* at 6.

describe its circumstances in detail.[112]

As for the condition of the concrete forms returned to the Debtor in March of 2005, the Anderson Defendants and Marini Defendants contend that the forms were in good condition. The Marini Defendants filed an affidavit signed by Paul Martin, an engineer hired to supervise the delivery of the forms to the Debtor, attesting to the good condition of the vast majority of the concrete forms when they were returned to the Debtor.[113]

The Anderson Defendants challenge the reliability of Hill and Armitage. According to the Anderson Defendants, Hill was angered when Anderson did not hire him after the Debtor's contracts were terminated.[114] The Anderson Defendants claim that Armitage was also disgruntled, because he was fired by Anderson in late 2004.[115]

I held a hearing on the Marini Motion on May 10, 2006. At the hearing, the Trustee elaborated on the Marini Motion as to what his reasoning was in deciding to settle the adversary proceeding as to the Marini Defendants. The Trustee expressed his belief that, while the Marini Defendants may be liable for some of the actions they took, the Debtor had breached its contracts and any potential recovery was therefore limited.[116] The Trustee stated that ". . . largely this boils down to a question of who do you believe because there are two very distinctly different

---

[112] Marini Reply Ex. G, Fax From VSL Re: December 16, 2004 Norwood Project Concrete Failure.

[113] Marini Reply Ex. J, Affidavit of Paul Martin.

[114] Second Anderson Reply p. 8 n. 10.

[115] *Id.* at 9.

[116] Transcript of Hearing on Marini Motion ("Marini Tr."), Docket No. 516, p. 7.

26

stories"[117] and that he believed the defendants.[118] He stated that the Debtor's accountant ". . .

ultimately if the litigation went forward could be helpful in trying to reconstruct and might be a

witness, basically told me that there wasn't really a lot he could do for me at the outset because

he didn't have that much information."[119] The Trustee also stated that he had attempted to

interview Hill but could not reach him.[120] Finally, the Trustee stated that the case is

administratively insolvent, and summed up by saying that "I just don't believe that pursuing [the

case] is going to benefit the estate because I don't believe the conspiracy theory."[121]

R&B, the Marini Defendants, and the Anderson Defendants also spoke at the hearing, and

each made arguments substantially similar to those made in their papers discussed above. In

addition to offering to pursue the Complaint on a contingency basis for the benefit of the estate,

R&B offered to buy the claims against Marini from the Trustee for $30,000, $5,000 in excess of

the $25,000 settlement amount.[122] I took the Marini Motion under advisement at the close of the

hearing.

One month later I held a hearing on the Anderson Motion. At the hearing, the Trustee,

the Anderson Defendants, and R&B presented many of the same arguments they had presented at

the May 10th hearing, and R&B again, in addition to offering to work on a contingency basis for

---

[117] *Id.* at 4.

[118] *Id.* at 7.

[119] *Id.* at 8.

[120] *Id.*

[121] *Id.* at 9.

[122] *Id.* at 29.

the benefit of the estate, offered to buy the causes of action against the Anderson Defendants, this time for $40,000, and again $5,000 in excess of the $35,000 settlement amount.[123]   At the close of the hearing I took the Anderson Motion under advisement for consideration concurrent with the Marini Motion.

## III. Analysis

### A. Legal Standard for Evaluating a Settlement

In considering whether to approve a settlement, a bankruptcy court must balance the value of the claim against the value of the proposed settlement. *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995).

> The specific factors which a bankruptcy court considers when making this determination include: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

*Id.* "The court's consideration of [the Jeffrey] factors should demonstrate whether the compromise is fair and equitable, and whether the claim the debtor is giving up is outweighed by the advantage to the debtor's estate." *Jeremiah v. Richardson*, 148 F.3d 17, 23 (1st Cir. 1998). The burden of proof is on the party seeking approval of the proposed settlement. *Underwriters at Lloyd's, London v. Chancellor Corp. et. al. (In re Adley)*, 333 B.R. 587, 608 (Bankr. D. Mass. 2005).

In determining the value of the claim and the proposed settlement, "the [bankruptcy judge] . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to

---

[123] Transcript of Hearing on Anderson Motion, Docket No. 538, 8.

28

be accorded some deference." *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l)*, 136 F.3d 45, 50 (1st Cir. 1998) (and citations contained therein). "When augmentation of an asset involves protracted investigation or potentially costly litigation, with no guarantee as to the outcome, the trustee must tread cautiously – and an inquiring court must accord him wide latitude should he conclude that the game is not worth the candle." *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 212 F.3d 632, 635 (1st Cir. 2000). The duty of the Chapter 7 trustee in considering whether to settle a claim is ". . . to reach an informed judgment, after diligent investigation, as to whether it would be prudent to eliminate the inherent risks, delays and expense of prolonged litigation in an uncertain case." *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992). Based upon the forgoing, I will first determine what weight to give the Trustee's determination that the Stipulations are beneficial to the estate, and I will then review the Stipulations in light of the factors set out in *Jeffrey*.

### B. The Adequacy of the Trustee's Investigation of the Debtor's Claims

At the hearing, the Trustee stated that his decision to settle followed an investigation of the allegations contained in the Complaint which consisted of interviews with Anderson, Marini, and Welby, a review of the pleadings and their accompanying exhibits, an interview with the Debtor's accountant, and several meetings with R&B. The question I must answer is whether this level of inquiry is sufficient to satisfy the First Circuit's standard set out in *In re Thompson* of "an informed judgment, [formed] after diligent investigation."

It appears at first glance that the Trustee pursued only a cursory investigation of the Debtor's claims, and closer inspection bears this impression out. At both hearings, the Trustee stated that he had interviewed only four individuals and had unsuccessfully sought to interview

29

only one more.  Three of the individuals the Trustee interviewed, Anderson, Marini, and Welby,

are parties in interest in the above-captioned adversary proceeding, and their blanket denials are

unsurprising and unenlightening.  The Trustee made no apparent attempt to interview the many

third party suppliers and subcontractors, or the many employees of the Debtor and the

defendants, who must have been witnesses to much of what went on at the Quincy, Waltham and

Norwood projects in late 2004 and early 2005.  By the Trustee's own admission, the accountant

of the Debtor might have proven a useful witness later in the adversary proceeding, but was of

little use now because he didn't have much information to work from.  As for the Trustee's

assertion that this case rests on a credibility determination, the fact that Welby invoked the Fifth

Amendment when questioned at her 2004 examination makes it difficult for me to rely on the

Trustee's confidence in the credibility of the defendants in this matter.  For these reasons I cannot

characterize the Trustee's investigation as diligent, and I will accord little weight to the Trustee's

determination that the Stipulations are in the best interest of the estate, and examine the

Stipulations on my own.

### C.  The Value of the Settlement to the Estate

#### i.  The Probability of Success in the Litigation Being Compromised

The first factor to consider under *Jeffrey* is the probability that the compromised litigation

will succeed.  70 F.3d at 185.  R&B, the Marini Defendants and the Anderson Defendants have

all pointed to evidence, some of which I have already described, that lends a degree of support to

each party's version of events.  Nothing clear emerges from a review of this evidence, but,

without making any determinations as to the admissibility of any of the materials submitted or

drawing any conclusions as to the probative value of those materials, the parties' submissions

30

considered in the aggregate indicate that R&B has some reasonable chance of prevailing on its claims against the Anderson Defendants and the Marini Defendants.

### ii. The Potential Difficulty of Collecting a Judgment

The Anderson Defendants, Marini Defendants, and the Trustee have offered no arguments suggesting that a judgment obtained against any of the defendants would be difficult to collect. There is no evidence that Anderson, Marini, or the constituent companies of the Anderson Defendants or Marini Defendants are in any particular financial distress or that any peculiar legal or financial circumstances exist that would make collection difficult.

### iii. The Complexity and Expense of the Litigation Involved

That pursuing the 20 counts of the Complaint would be a complex and difficult undertaking is unquestionable. The facts of the Debtor's decline, particularly the financial details of its and the defendants' activities in the Debtor's final months, are dense and will be a challenge for R&B and the defendants to unravel and clearly present in court, but the task is by no means impossible and its difficulty is not particular to this case. In the area of contentious business bankruptcies, litigating the Debtor's claims does not present a task of unusual complexity.

As for the expense of litigating this matter, R&B's willingness to prosecute the claims made in the Complaint for the benefit of the estate on a contingent basis removes any burden upon the estate. Although this litigation will no doubt involve considerable expense, such expense need not be borne by the estate, and therefore is not of my concern in evaluating the Stipulations.

31

### iv. The Benefit of the Stipulations to Creditors

That the Debtor's estate as it now stands is administratively insolvent is unchallenged here. There is presently only $5,638.36 in cash in the estate and, according to the Trustee, there are substantial administrative and priority claims. One of the creditors with a potentially large administrative claim is R&B, the Debtor's former Chapter 11 counsel, and the only party-in-interest who stands in opposition to the Motions to Approve Stipulations. The Marini Defendants and the Anderson Defendants, both of whom appear to have general nonpriority unsecured claims, are the only parties-in-interest who voiced support for the Trustee's Motions to Approve Stipulations. If allowed, the Motions to Approve Stipulations will almost certainly provide no benefit to general nonpriority unsecured creditors, and only a minimal benefit to secured or priority unsecured creditors. R&B is correct in characterizing the Stipulations as providing only nuisance value.

The Complaint, though by no means certain to bear fruit, has at least a modest chance of providing a recovery to the estate far in excess of that provided by the Stipulations. Litigating the claims contained in the Complaint will not subject the Trustee to any extraordinary costs, or, in fact, to any considerable costs at all. Therefore, I conclude that the Stipulations provide little to no benefit to creditors considering the opportunities for recovery that they would forfeit if the Stipulations were approved..

## IV. Conclusion

Because I find that I do not need to defer to the Trustee's decision to settle and that the *Jeffrey* factors weigh against accepting the Stipulations, I hold that the Trustee has not met its burden of demonstrating the benefit of the proposed settlement and deny the Motions to Approve

Stipulations.

William C. Hillman
United States Bankruptcy Judge

Dated:  7/27/06

Counsel Appearing:

For the Trustee, Joseph G. Butler, Barron & Stadfeld, P.C., Boston, MA.

For R&B, Paul S. Samson, Riemer & Braunstein, Boston, MA.

For the Anderson Defendants, Vincent J. Pisegna, Krokidas & Bluestone, Boston, MA.

For the Marini Defendants, Harold B. Murphy, Hanify & King, Boston, MA.